# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal No. 18-270 |
| ) | Judge Nora Barry Fischer |
| CHRISTIAN BURRUS, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

In this case, Defendant Christian Burrus is charged with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Docket No. 1). The charge arises from a traffic stop of a vehicle in which he was a passenger on July 23, 2018 in Penn Hills. Presently before the Court is a motion to suppress evidence filed by Defendant and the Government's opposition thereto. (Docket Nos. 29; 30; 33; 35; 38). The Court held a suppression hearing on May 8, 2019, the official transcript of which was filed on June 7, 2019. (Docket Nos. 40; 41). The parties submitted post-hearing proposed findings of fact and conclusions of law on July 15, 2019 and responses to same on July 29, 2019. (Docket Nos. 45-48). After careful consideration of all of the parties' filings and the credible evidence of record, and for the following reasons, Defendant's Motion to Suppress [29] is denied.

### II. BACKGROUND

*A. Factual Findings*

At the hearing, the Government presented the testimony of Penn Hills Police Department Officer Dustin Hess and introduced two exhibits, i.e., the dash camera video of the traffic stop and Officer Hess' police report documenting the events. (Docket No. 42; Govt. Exs. 1; 2). Defendant did not call any witnesses nor admit any exhibits but conducted thorough cross-

1

examination of the Government's witness. (*See id.*). In this Court's estimation, based on his demeanor and testimony in response to the questioning of the attorneys and the Court at the suppression hearing, Officer Hess provided credible testimony as to the events in question, despite efforts at impeachment. *See United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)) ("'[w]hen findings are based on determinations regarding the credibility of witnesses ... for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'"). He also presented as an experienced law enforcement officer.

In this regard, Officer Hess earned a bachelor's degree in criminal justice from Point Park, graduated from the policy academy and has approximately eight years of experience in law enforcement. (Docket No. 42 at 4-5). Prior to joining the Penn Hills police force four years ago, he worked as a police officer for West Homestead Borough and the University of Pittsburgh. (*Id*. at 4-6). Officer Hess has received considerable training on topics such as: high risk vehicle stops, officer safety, traffic patrol drug interdiction and street survival. (*Id*.). He has also participated in hundreds of traffic stops during the course of his career. (*Id*. at 6).

On the warm, sunny afternoon of July 23, 2018, Officer Hess was on a routine traffic patrol in Penn Hills, observing traffic from a BP gas station at the intersection of Frankstown Road and Robinson Boulevard. (Docket No. 42 at 4, 6, 27, 36). He described that location as a high crime area, although no data or statistics were admitted into the record to confirm his testimony. (*Id*. at 7, 41). As part of his traffic patrol duties, Officer Hess often checks license plate numbers for proper registration in the National Crime Information Center ("NCIC") database which is accessible from a computer in his police vehicle. (*Id*. at 7-8). He ran such a

check on a blue Nissan Maxima with license plate number JPJ-7902 that he observed driving east on Frankstown Road past his location at the gas station. (*Id*.). The results of the NCIC query included that: the vehicle's registration was expired; the vehicle was owned by Daquela Donald; and Ms. Donald's driver's license was suspended. (*Id*. at 8).

As can be seen and heard on the dash cam video, (Govt. Ex. 2), Officer Hess proceeded to follow the blue Maxima, which had turned right from Frankstown Road onto Graham Boulevard, an unmarked, two-way brick covered road. (Docket No. 42 at 10). After pursuing the vehicle for a short period of time, Officer Hess conducted a traffic stop at 4:05 p.m., and the vehicle pulled over without incident near the intersection of Graham Boulevard and Royal Avenue. (*Id*. at 13-14). Officer Hess contacted dispatch to inform them that he was making a traffic stop of the vehicle and to provide his location for safety reasons in the event that the encounter "would turn south very quickly, at least everybody would know where I'm at." (*Id*. at 9-10). Officer Hess was outnumbered as the vehicle had three occupants: a female driver; a male in the front passenger seat; and a female in the rear driver's side seat. (*Id*. at 10). The male passenger, who turned out to be the Defendant, was significantly larger than him as well. (*Id*. at 19, 39, 41). Aside from the registration violation and potentially a driver with a suspended license, Officer Hess had no additional information that any of the occupants had been involved in any other type of criminal activity when he pulled the vehicle over. (*Id*. at 25-26, 42). However, he explained that he follows routine protocol for officer safety in situations where he is outnumbered by gathering identification information about the vehicle's occupants so that he can run their information through NCIC and knows "who he is dealing with." (*Id*. at 11, 39).

Officer Hess approached the driver's side of the vehicle and spoke briefly with the driver and the other occupants. (Docket No. 42 at 10). He initially asked the driver if she had

3

identification, she responded that she did not. (*Id*.). She identified herself as Daquela Donald and acknowledged that: the vehicle's registration was expired and her license was suspended. (*Id*.). She also could not produce any documents including the registration, a license or identification card or an insurance certificate. (*Id*.). Officer Hess asked if anyone in the car had identification and upon hearing no answer, he took out his memo pad and pen and asked for the passengers' names. (Govt. Ex. 2). The male passenger told the officer that his name was Christian Burrus and provided his date of birth. (Docket No. 42 at 11-13, 29). The female passenger advised that her name was Tomieka Maddox. (*Id*. at 13). The driver told Officer Hess that someone would come pick up the vehicle; he thanked her for being honest; and told her he would try to cut her a break on the citations. (*Id*. at 27; Govt. Ex. 2). After gathering this information, Officer Hess returned to his police cruiser. (*Id*.).

Officer Hess testified that he recognized Defendant upon approaching the vehicle because he recalled that a wanted poster with his name and photograph was posted in the police station assembly room indicating that a warrant for his arrest was pending at one time. (Docket No. 42 at 11-13, 38). He remembered that narcotics detectives were involved in posting the photograph and believed that he had been wanted for a firearm or narcotics charge. (*Id*. at 12). Officer Hess could not recall specifically when he saw the poster but believed that it had been taken down approximately one year prior to the stop. (*Id*. at 32). Officer Hess further explained that he observed that Defendant would not make eye contact with him; was sweating profusely; and was acting nervously. (*Id*. at 11-12). Indeed, Officer Hess stated that he had "never seen a passenger that nervous during a traffic stop." (*Id*. at 11-12). Defendant's actions led Officer Hess to conclude that "criminal activity may be afoot" but he did not have information about any specific crimes he may have committed. (*Id*. at 33).

4

When he returned to his vehicle, Officer Hess ran the NCIC check on the Defendant which revealed that he had an active warrant for his arrest for a probation violation as well as a suspended driver's license. (Docket No. 42 at 16-17). A backup K9 unit arrived. (*Id*. at 19). Officer Hess is heard commenting to Officer Klobucher that the Defendant was nervous and that he remembered him. (Govt. Ex. 2). Officer Hess confirmed that the warrant was active by calling dispatch. (Docket No. 42 at 19-20). After confirming the warrant, Officer Hess had an obligation to arrest Defendant and he did not run the information on the other occupants of the vehicle at that time. (*Id*.). This entire process took approximately two and a half minutes, at which time Defendant, Ms. Donald and Ms. Maddox remained in the vehicle. (Govt. Ex. 2 at 4:20 to 7:01).

Officer Hess moved quickly to effectuate Defendant's arrest while Officer Klobucher and the K9 remained near the rear of the vehicle. (Govt. Ex. 2). Officer Hess returned to the driver's side window, told Ms. Donald that he confirmed her license was suspended, and directed her to turn off the vehicle and hand him the keys, which she did. (Docket No. 42 at 20). He asked the occupants if they had anything illegal on them but did not receive a response. (*Id*. at 21). Officer Hess then moved to the passenger side window and questioned Defendant if had any weapons on him. (*Id*.). After Defendant did not respond, Officer Hess directed him to step out of the vehicle. (*Id*.). Defendant complied. (*Id*.). Officer Hess placed handcuffs on Defendant and conducted a pat down search, which revealed that Defendant was in possession of a firearm in his waistband. (*Id*. at 22-23). He discovered the firearm at approximately 4:12 p.m. or only seven minutes after initiating the traffic stop of the vehicle. (*Id*. at 38).

After Defendant and the firearm were secured, Officer Hess returned to his vehicle to complete his duties relative to the traffic stop. (Docket No. 42 at 38-40). He ran an NCIC check

on Ms. Maddox and learned that she also had a suspended license. (*Id*. at 17-18, 38). He then waited near the vehicle until Ms. Donald's grandmother arrived on the scene to drive the vehicle away. (*Id*. at 40). Officer Hess gave Ms. Donald a verbal warning and released her from the scene. (*Id*. at 41). While transporting Defendant to the police station, he made comments to himself which were overheard by Officer Hess and recorded, i.e., "So fuckin stupid. All for $150" and "the middle man always gets fucked."[1] (Govt. Ex. 1).

Officer Hess' subsequent investigation revealed all of the following: the firearm was stolen out of North Strabane Township; Defendant has a prior conviction for manufacture, delivery or possession with intent to deliver a controlled substance such that he was not authorized to possess a firearm; and Defendant did not have a license to possess a firearm. (Govt. Ex. 1). Defendant was charged with two felony violations of the Uniform Firearms Act and one felony count of receiving stolen property. (*Id*.). Ultimately, those state charges were nolle prossed in favor of this federal prosecution alleging a violation of 18 U.S.C. § 922(g)(1).

B. *Relevant Procedural History*

The grand jury returned the one-count indictment against Defendant on October 9, 2018. (Docket No. 1). After receiving extensions of time to file pretrial motions, Defendant filed the instant motion to suppress on February 26, 2019. (Docket Nos. 15; 22; 29). As noted, the motion was fully briefed and the Court convened a motion hearing on May 8, 2019, the official transcript of which was filed on June 7, 2019. (Docket Nos. 29; 30; 33; 35; 38; 40; 42). The parties then submitted proposed findings of fact and conclusions of law on July 15, 2019 and responses thereto on July 29, 2019. (Docket Nos. 45-48). As the motion has been fully briefed and argued, it is now ripe for disposition.

---

[1] The Court notes that the Government has agreed not to present the subsequent statements made by Defendant in response to questioning by Officer Hess during its case-in-chief. (Docket No. 33 at 9-10).

III. LEGAL STANDARD

It is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted).

IV. DISCUSSION

In his post-hearing submissions of proposed findings of fact and conclusions of law, Defendant concedes that the traffic stop was lawful but persists in his argument that the traffic stop was impermissibly lengthened beyond its mission to investigate the traffic violations by Officer Hess' running of the NCIC warrant check of Defendant. (Docket Nos. 30; 45). He further argues that Officer Hess did not develop reasonable suspicion to investigate him for an active arrest warrant or any other criminal activity. (*Id.*). All told, he seeks suppression of the firearm recovered from his person and any other evidence (including his statements) as fruit of the poisonous tree. (*Id.*). The Government counters that Officer Hess did not deviate from the traffic stop's mission as the criminal history check was reasonably necessary for officer safety and alternatively maintains that there was reasonable suspicion for Officer Hess to investigate whether he had a warrant and that the attenuation doctrine should be applied to defeat the instant motion. (Docket Nos. 33; 46). After careful consideration of the parties' arguments in light of the credible evidence of record, the Court agrees with the Government's position and will deny Defendant's motion.

    A. *Mission of the Traffic Stop/ Reasonable Suspicion*

As noted, Defendant does not challenge the constitutionality of the traffic stop and the Court agrees that the Nissan Maxima was lawfully pulled over by Officer Hess upon reasonable

suspicion that the driver had committed vehicle registration and driver's license violations. The law is well established that:

> [u]pon making a lawful traffic stop of a vehicle, police officers are granted the authority "to detain the automobile and its occupants pending an inquiry into a vehicular violation." [*Arizona v. Johnson*, 555 U.S. 323, 327, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009)]. The officers then "may exercise reasonable superintendence over the car and its passengers," and have the discretion to either: (1) order the driver and passengers to get out of the vehicle; or (2) remain in the vehicle while the officers investigate the violation. [*United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004)] (citations omitted).

*United States v. Edmonds*, Crim. No. 12-70, 2013 WL 6002234, at *8 (W.D. Pa. Nov. 12, 2013). "Once a valid traffic stop is initiated, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation," *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quotation and citation omitted), of "both 'past criminal activity' and 'imminent or ongoing criminal activity,'" *United States v. King*, 764 F. App'x 266, 268 (3d Cir. 2019) (quoting *United States v. Hensley*, 469 U.S. 221, 228, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)).

However, the Fourth Amendment is violated "when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes.'" *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (quoting *Rodriguez v. United States*, ––– U.S. –––, 135 S.Ct. 1609, 1615, 191 L.Ed.2d 492 (2015)). When considering this type of claim, the Court evaluates two factors: first, when the traffic stop was "measurably extended" to investigate non-traffic related crimes; and second, if the facts available to the officer were sufficient to establish reasonable suspicion at that moment. *See Green*, 897 F.3d at 179. "[A]bsent reasonable suspicion, any 'unrelated inquiries [that] measurably extend the duration of [a] stop are unlawful.'" *Green*, 897 F.3d at 179 (quoting *Rodriguez*, 135 S.Ct. at 1615). At the same time,

8

"'ordinary inquiries incident to' a traffic stop […] which serve the purpose of enforcing the traffic code" are permissible. *Id.* For example, "[a]ctions like 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance'" constitute ordinary inquiries incident to the traffic stop. *Id.* "Such inquiries are permissible because they serve the purpose of the traffic stop: ensuring roadway safety." *United States v. Terry*, No. 3:18-CR-24, 2019 WL 2176330, at *13 (W.D. Pa. May 20, 2019) (citing *Rodriguez,* 135 S.Ct. at 1615; *Clark*, 902 F.3d at 410). However, "measures aimed at detecting criminal activity more generally," may not measurably extend the duration of the traffic stop without reasonable suspicion. *Green*, 897 F.3d at 179-80 (citing *Rodriguez,* 135 S. Ct. at 1615).

> Reasonable suspicion, while not rigidly defined, may be the result of the following factors: "specialized knowledge and investigative inferences," "personal observation of suspicious behavior," "information from sources that prove to be reliable, and information from sources that-while unknown to the police-prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip." *Brown,* 448 F.3d at 247 (citation omitted). Depending upon the totality of the circumstances, reasonable suspicion may be the result of one or a combination of the above and other relevant factors. *Id.*
>
> In evaluating the officer's actions, the Court must defer to the "officer's knowledge of the nature and nuances of the type of criminal activity the officer has observed." *United States v. Robertson*, 305 F.3d 164, 166 (3d Cir. 2002) (citing *United States v. Nelson*, 284 F.3d 472 (3d Cir. 2002)). In addition, the United States Court of Appeals for the Third Circuit gives considerable deference to police officers' determinations of reasonable suspicion. *See, e.g., Nelson*, 284 F.3d at 482. Similarly, courts often defer to personal observations and conclusions on the theory that experienced officers can infer criminal activity from conduct that may seem innocuous to a lay person. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also* [*Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)].

9

*United States v. Gardenhire*, Cr. No. 15-87, 2017 WL 1022578, at *4-5 (W.D. Pa. Mar. 16, 2017).

In this Court's estimation, Officer Hess' actions in conducting the NCIC check on Defendant neither deviated from the mission of the traffic stop nor measurably extended same and the totality of the circumstances otherwise demonstrate that his actions were supported by reasonable suspicion that Defendant was the subject of an active arrest warrant. The Court's rationale follows.

Initially, "[a]uthority for the seizure […] ends 'when tasks tied to the traffic infraction are—or reasonably should have been—completed.'" *United States v. Frierson*, 611 F. App'x 82, 85 (3d Cir. 2015). Here, the evidence of record establishes that the traffic stop was not completed and could not have been at the time that Officer Hess conducted the two and a half minute NCIC check on Defendant. To this end, the circumstances presented to Officer Hess when he returned to his police cruiser involved an unlicensed driver, with no identification, driving an unregistered vehicle, with no proof of insurance. (Docket No. 42 at 10-14). The other occupants in the vehicle, including Defendant, could not produce driver's licenses. (*Id.*). While he had confirmed that Ms. Donald was unlicensed and that the vehicle was unregistered prior to pulling her over and she admitted to same during their brief discussion, the traffic stop was not finished because Officer Hess could not permit any of the occupants to drive the vehicle away from the scene without further investigation. He also could not leave the vehicle on the side of the road but needed to have a licensed driver pick it up or call for a tow truck to safely remove the vehicle from the road. (*Id.* at 38-41). Certainly, either occurrence would have taken more than the two and a half minutes it took Officer Hess to run the NCIC check on Defendant. Indeed, prior to returning to his police cruiser, Officer Hess was told by the driver that another

individual would be picking up the vehicle but that person had not yet arrived. (*Id*. at 27). Therefore, Defendant's motion must be denied because the alleged deviation from the mission of the traffic stop did not add any time to the investigation of same. *See Green*, 897 F.3d at 182 (noting that an extension is anything that "adds time" to the traffic stop).

Next, regardless of the timing of events, "most courts confronted with the issue have determined that checking a passenger's driver's license in addition to the vehicle driver's license is not an impermissible extension of a traffic stop." *United States v. Terry*, No. 3:18-CR-24, 2019 WL 2176330, at *15 (W.D. Pa. May 20, 2019). As Judge Gibson persuasively explains in *Terry*, with numerous citations of relevant authority, "[s]ome courts have held that checking a passenger's identification during a traffic stop is appropriate because it is necessary to ensure officer safety, which is part of the 'mission' of a traffic stop," while "[o]ther courts have determined that checking a passenger's license is permissible because it is a normal inquiry related to addressing a traffic violation," *id*. at *15-16 (citations omitted); *see also United States v. Baldonado-Garcia*, Crim. No. 11-215, 2012 WL 135698, at *3 (W.D. Pa. Jan. 17, 2012) ("Trooper Watt's request for defendant's identification was reasonably based on ensuring officer safety at the scene."). The record here supports both of these conclusions as Officer Hess explained that it was his routine practice to obtain identification information from passengers in vehicles with multiple occupants for his own safety due to the fact that he is outnumbered and wants to know who he is dealing with in order to protect himself. *See Rodriguez*, 135 S.Ct. at 1616 (an officer is permitted to take "negligibly burdensome precautions in order to complete his [traffic] mission safely."). Further, the occupants of the car are witnesses of the events, including Ms. Donald's admissions, making it reasonable to not only ask the occupants for their names but to also confirm their identities. *See id.*

11

The cases relied upon by Defendant are non-binding and/or distinguishable, starting with *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019). There, the Court proclaims that "[a] demand for a passenger's identification is not part of the mission of a traffic stop," but our Court of Appeals for the Third Circuit eschews endorsing such bright-line rules in favor of evaluating the totality of the circumstances, *see Green*, 897 F.3d at 179-82. The Court also did qualify its holding stating that "[t]he identity of the passenger, however, will ordinarily have no relation to a driver's safe operation of a vehicle." *Landeros*, 921 F.3d at 868. It determined that Landeros' identity was unnecessary to investigating the traffic violation because the vehicle he was in was stopped for speeding 11 mph over the posted limit and there is no mention that the driver was unlicensed akin to the situation here. *See id.* The decisions by the Court of Appeals in *United States v. Clark*, 902 F.3d 404 (3d Cir. 2018) and the District Court in *Davila v. Northern Regional Joint Police Board*, 370 F. Supp. 3d 498 (W.D. Pa. Feb. 27, 2019) are similarly distinguishable. Both cases involved officers who had confirmed the license, registration and insurance information of the drivers such that they should have been free to drive away but they continued with an unrelated investigation into criminal activity without reasonable suspicion. *See id.* Again, the circumstances here are markedly different because Ms. Donald could not lawfully be permitted to drive away in the subject vehicle continued the investigation by Officer Hess.

In sum, the Court finds that the NCIC check on Defendant was reasonably necessary to further the investigation of the traffic violation and the safety of Officer Hess and also did not measurably extend the duration of the traffic stop. *See Green*, 897 F.3d at 179; *see also Utah v. Strieff*, 136 S. Ct. 2056, 2063, 195 L. Ed. 2d 400 (2016) (quoting *Rodriguez*, 135 S.Ct. at 1616)

12

("The officer's decision to run the warrant check was a 'negligibly burdensome precautio[n]' for officer safety.").

Alternatively, the Court holds that even if it had determined that Officer Hess extended the duration of the traffic stop for the unrelated purpose of conducting the NCIC check, which it expressly does not, the totality of the circumstances supports a finding that this experienced officer had reasonable suspicion to do so. Defendant attempts to demonstrate that reasonable suspicion is lacking by pointing to each of the facts individually and offering innocent explanations for them. (Docket Nos. 29; 35; 45). However, as the Court of Appeals has recognized,

> consistent with the totality of the circumstances approach, reasonable suspicion cannot be defeated by a so-called "divide-and-conquer" analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each.

*Green*, 897 F.3d at 183 (quoting *District of Columbia v. Wesby*, ––– U.S. ––––, 138 S.Ct. 577, 589, 199 L.Ed.2d 453 (2018)). A court must look to the "totality of the circumstances—the whole picture" to determine whether the officer had "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)

The "whole picture" supporting the instant officer's reasonable suspicion includes all of the following. Officer Hess was conducting a routine traffic patrol in a familiar area of Penn Hills which he described as a high crime area. (Docket No. 42 at 4, 6, 27, 36). As noted above, he pulled over a vehicle with an expired registration being driven by an unlicensed driver who could not produce any identification, registration or insurance. (*Id*. at 10; Govt. Ex. 2). Neither passenger could produce driver's licenses. (*Id*.). He recognized the Defendant as an individual

who was featured on a wanted poster that hung in the police department's assembly room in the past. (Docket No. 42 at 11-13, 38). He could not recall specifics but believed that Defendant was wanted for either narcotics or firearms violations, i.e., serious felony offenses. (*Id*. at 32). Officer Hess observed that Defendant, who is a much larger man than he, refused to make eye contact; was sweating profusely; and acting more nervously than any other passenger he had encountered during the hundreds of routine traffic stops he has conducted over his eight-year career. (*Id*. at 11-12, 32-33). In short, Defendant's behavior upon seeing the police was consistent with someone who was seeking to avoid police contact and concerned about being arrested. Collectively, these facts provided reasonable suspicion for him to conduct a brief investigation into whether an active warrant existed for Defendant's arrest. *Green*, 897 F.3d at 184-185. As the Supreme Court has held,

> where police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice. Restraining police action until after probable cause is obtained would not only hinder the investigation, but might also enable the suspect to flee in the interim and to remain at large. Particularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible. The law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes.

*Hensley*, 469 U.S. at 229. The same is true in this case as Officer Hess' minimally invasive investigation to run Defendant's information through NCIC based on a particularized and objective basis that he was a wanted individual was clearly outweighed by the public interests in solving past crimes and bringing offenders to justice. *See Cortez*, 449 U.S. at 417-18.

For all of these reasons, Defendant's motion to suppress is denied.

*B. Attenuation Doctrine*

Although the Court's disposition renders further discussion unnecessary, the Government has also invoked the attenuation doctrine, arguing that the existence of the valid warrant for Defendant's arrest breaks the casual chain between any unlawful seizure of him and the recovery of the firearm from his person. (Docket Nos. 33; 46). Defendant contends that the attenuation doctrine is inapplicable because Officer Hess allegedly committed a flagrant violation of his constitutional rights. (Docket Nos. 35; 41). Having considered the matter, the Court holds alternatively that if a constitutional violation were to be found on this record, the attenuation doctrine would apply to defeat Defendant's motion to suppress the firearm recovered in the search incident to his arrest under the valid, pre-existing and untainted arrest warrant.

Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016) (quoting *Hudson v. Michigan*, 547 U.S. 586, 593, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006)). "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence, which often has nothing to do with a defendant's actions." *Strieff*, 136 S.Ct. at 2061. The intervening circumstances to which the doctrine applies include the existence of "a valid, pre-existing and untainted arrest warrant." *Id.* In determining the exception's applicability, the Court evaluates three factors:

> First, we look to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. [*Brown v. Illinois*, 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)]. Second, we consider "the presence of intervening circumstances." *Id.*, at 603–604, 95 S.Ct.

> 2254. Third, and "particularly" significant, we examine "the purpose and flagrancy of the official misconduct." *Id*., at 604, 95 S.Ct. 2254.

*Strieff*, 136 S. Ct. at 2061-62. The Court now reviews each of these factors, in turn.

Regarding the first factor, the temporal proximity between the alleged unlawful act, running the NCIC check and the discovery of the firearm was only a few minutes. As the Supreme Court found in *Strieff*, "such a short time interval favors suppression," but is not dispositve. *Id.* at 2062.

As to the second factor, the valid, pre-existing and untainted warrant for Defendant's arrest based on a probation violation, which is not challenged by the defense and was not connected to the traffic stop, strongly favors the Government. *Id*. "A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions." *Strieff*, 136 S. Ct. at 2062 (quoting *United States v. Leon*, 468 U.S. 897, 920, n. 21, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)) (internal quotations omitted). After Officer Hess discovered the existence of the warrant, he had an obligation to arrest Defendant and take him into custody. *Id.* Officer Hess was also plainly authorized to conduct a lawful search incident to Defendant's arrest for his own safety during which the firearm was seized from Defendant's waistband. *Id.*

The third factor evaluating the "purpose and flagrancy of the official misconduct" likewise favors the Government's position. *Id*. at 2063. The defense maintains that the alleged constitutional violation of extending the traffic stop two and a half minutes to conduct an NCIC check was "flagrant" but this Court disagrees. For the reasons noted in § IV.A of this Memorandum Opinion, Officer Hess acted reasonably and did not measurably extend the duration of the traffic stop to conduct an unrelated investigation into Defendant. Even if this

16

Court is incorrect on those points, any errors in Officer Hess' "judgment hardly rise to a purposeful or flagrant violation of [Defendant's] rights." *Strieff*, 136 S.Ct. at 2063. The initial traffic stop was lawfully conducted; the "decision to run the warrant check was a 'negligibly burdensome precaution' for officer safety"; and, the search incident to Defendant's arrest was unquestionably lawful. *Id.* (quoting *Rodriguez,* 135 S.Ct. at 1616).

Overall, the two factors favoring the Government's position far outweigh the one factor which bolsters Defendant's arguments. As in *Strieff*, the existence of the warrant is a critical intervening circumstance which breaks the casual chain between the alleged unconstitutional extension of the traffic stop and the search and seizure of the firearm from Defendant's person. *Id.* Therefore, Defendant's motion is also denied on this additional basis.

V. CONCLUSION

Based on the foregoing, Defendant's motion to suppress [29] is denied. An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

Dated: August 29, 2019

cc/ecf: All counsel of record.